IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| ELLIS TODD WADE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 6:17-cv-01395-TMP |
| ) | |
| NANCY A. BERRYHILL, ) | |
| *Deputy Commissioner for* ) | |
| *Operations of the Social Security* ) | |
| *Administration*, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

The plaintiff, Ellis Todd Wade, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for a period of disability, Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Wade timely pursued and exhausted his administrative remedies, and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). The parties have consented to the exercise of dispositive jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 15).

## I. Introduction

Wade was 47 years old on the date of the ALJ's opinion. (Tr. at 18, 145). He graduated from high school in 1989. (Tr. at 180). He previously worked as a supervisor at Houston Wood Products, Inc., from 1989 until 2013, building furniture and operating heavy machinery. (Tr. at 159, 180). He also was self-employed as a livestock rancher in 2014. (Tr. at 49, 159). Wade claims that he became disabled on May 3, 2013, due to bilateral hip replacements, high blood pressure, high cholesterol, "numbness in feet and legs," "chronic pain in both shoulders," "severe pain in legs and hips," and "border line diab[etes]." (Tr. at 179). At the ALJ's hearing, however, he amended his disability onset date to December 29, 2014. (Tr. at 10, 30).

When evaluating the disability of individuals over the age of eighteen, the regulations prescribe a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The first step requires a determination of whether the claimant is "doing substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If he is, the claimant is not disabled and the evaluation stops. *Id*. If he is not, the Commissioner next considers the effect of all of the physical and mental impairments combined. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). These impairments must be severe and must meet the durational requirements before a

claimant will be found to be disabled.  *Id.*  The decision depends on the medical evidence in the record.  *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971).  If the claimant's impairments are not severe, the analysis stops.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  Otherwise, the analysis continues to step three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairments fall within this category, he will be found disabled without further consideration.  *Id.*  If they do not, a determination of the claimant's residual functional capacity will be made and the analysis proceeds to the fourth step.  20 C.F.R. §§ 404.1520(e), 416.920(e).  Residual functional capacity ("RFC") is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite his impairments.  20 C.F.R. § 404.945(a)(1).

  The fourth step requires a determination of whether the claimant's impairments prevent him from returning to past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant can still do his past relevant work, the claimant is not disabled and the evaluation stops.  *Id.*  If the claimant cannot do past relevant work, then the analysis proceeds to the fifth step.  *Id.*  Step five requires the court to consider the claimant's RFC, as well as the claimant's age, education, and past work experience, in order to determine if he can do other

work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can do other work, the claimant is not disabled. *Id.* The burden is on the Commissioner to demonstrate that other jobs exist which the claimant can perform; and, once that burden is met, the claimant must prove his or her inability to perform those jobs in order to be found disabled. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

Applying the sequential evaluation process, the ALJ found that Wade meets the nondisability requirements for a period of disability and DIB and was insured through December 31, 2019. (Tr. at 12). He further determined that Wade has not engaged in substantial gainful activity since the amended alleged onset of his disability on December 29, 2014. *Id.* According to the ALJ, the plaintiff has the following impairments that are considered "severe" based on the requirements set forth in the regulations: arthritis with a history of bilateral hip arthroplasty, obesity, hypertension, and hyperlipidemia. *Id.* However, he found that these impairments neither meet nor medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 13). The ALJ did not find Wade's allegations related to the limiting effects of his impairments to be entirely credible (tr. at 14), and he determined that he has the following residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift 20 pounds occasionally. He can stand and/or walk six hours and sit six hours with a sit/stand option on the half hour for a few minutes

while continuing to work. He cannot push or pull with the bilateral lower extremities. He occasionally can climb stairs and ramps; balance, kneel, crawl, stoop, and crouch. He cannot work at unprotected heights or climbing ladders, ropes, or scaffolds.

(Tr. at 13).

According to the ALJ, Wade is unable to perform any of his past relevant work, he is a "younger individual," and he has "at least a high school education," as those terms are defined by the regulations. (Tr. at 16-17). He determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not he has transferable job skills." (Tr. at 17). The ALJ found that "jobs exist in significant numbers in the national economy that he can perform," specifically as a furniture rental consultant, a sales attendant, and a bottling line attendant. *Id.* The ALJ concluded his findings by stating that Plaintiff "has not been under a disability, as defined in the Social Security Act, from December 29, 2014, through the date of this decision." (Tr. at 18).

## II. Standard of Review

This court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the

Commissioner, and (2) whether the correct legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Mitchell v. Commissioner, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). The court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Miles*, 84 F.3d at 1400. "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Federal Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if this court finds that the evidence preponderates against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400. No decision is automatic, however, for "despite this deferential standard [for review of claims] it is imperative that the court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v.*

*Bowen*, 815 F.2d 622, 624 (11th Cir. 1987). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

### III. Discussion

Wade argues that the ALJ's decision should be reversed and remanded for two reasons. First, he contends that the ALJ failed to accord proper weight to the medical source statement submitted by his treating physician, Dr. John Bivona. (Doc. 12, pp. 3-11). Second, the plaintiff contends that the ALJ's RFC is not supported by substantial evidence because the ALJ failed to properly consider Dr. Bovina's medical source statement and, as such, the RFC conflicts with the medical record. (Doc. 12, pp. 11-14).

Under prevailing law, a treating physician's testimony is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotations omitted). The weight to be afforded a medical opinion regarding the nature and severity of a claimant's impairments depends, among other things, upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source. *See*

20 C.F.R. §§ 404.1527(d), 416.927(d). Furthermore, "good cause" exists for an ALJ not to give a treating physician's opinion substantial weight when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (*citing Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (holding that "good cause" existed where the opinion was contradicted by other notations in the physician's own record).

The court must also recognize that opinions such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). The Court is interested in the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician are relevant to the ALJ's findings, but they are not determinative, as it is the ALJ who bears the

responsibility for assessing a claimant's residual functional capacity. *See, e.g.,* 20 C.F.R. § 404.1546(c).

Dr. Bivona submitted a medical source statement on Wade's behalf on February 24, 2016. (Tr. at 360-362). In the medical source statement, Dr. Bivona asserted that he believed Wade would "experience symptoms (pain) from his underlying medical condition . . . [because] he has bilateral hip replacements [and] suffers from chronic pain." (Tr. at 360). Furthermore, Dr. Bivona noted that "prolonged standing really exacerbates [Wade's] pain" and that "his gait is abnormal due to hip problems." (Tr. at 360-61). Moreover, Dr. Bivona contends that Wade's "underlying medical conditions could reasonably be expected to cause his subjective complaints" and that Wade "is [not] exaggerating his complaints of pain, or malingering." (Tr. at 361-62).[1]

---

[1] Dr. Bivona also asserted that prolonged standing or sitting, in addition to maintaining a work posture without the opportunity to recline, "during an [eight] hour workday would increase the level of pain [that Wade] experiences." (Tr. at 360-61). Therefore, according to Dr. Bivona, "the increase in his pain [would] be to such an extent that it would cause serious distraction from job tasks and/or result in a failure to complete job tasks in a timely manner on more than an occasional basis during a typical workday and/or workweek." (Tr. 361). However, these assessments speak to the plaintiff's RFC. It is well-settled that the responsibility for assessing the RFC of a claimant is a matter reserved to the ALJ. *See* 20 C.F.R. §§ 404.1527(e), 416.927(d). Under the regulations governing Social Security benefits, the RFC is not a medical assessment; rather, it is "the most [the plaintiff] can do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC is based upon "all relevant medical and other evidence[] of a claimant's remaining ability to work despite his impairment." *Castle v. Colvin*, 557 F. App'x 849, 852 (11th Cir. 2014). However, the ALJ is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006), citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). As previously stated, Dr. Bivona's statements are relevant to the ALJ's decision, but they are not determinative, because the ALJ bears the responsibility for assessing the claimant's RFC. *See, e.g.*, 20 C.F.R. § 404.1546(c).

The ALJ gave little weight to "[t]he opinion of Dr. Bivona because it is inconsistent with his treatment notes . . . ." (Tr. at 15). Specifically, the ALJ concluded the following:

> In a medical source statement of February 24, 2016, Dr. Bivona found that "prolonged standing really exacerbates" the claimant's "chronic pain" and "abnormal gait" following bilateral hip replacements (Exhibit 9F). He opined that "work posture" without the ability to recline for eight hours would increase the level of pain such that the claimant would suffer from serious distraction from job tasks and/or failure to complete job tasks in a timely manner on more than an occasional basis during a typical workday and/or work week. On the contrary, treatment notes of June and October 2015 show that the claimant had "no ataxic gait" (Exhibits 7F and 8F). The claimant was advised to "exercise routinely,'" being "counseled for physical activity." With regard to the level of pain, treatment notes of June 2015 show that the claimant's reported arthritis pain of only a "3" on a 10-point scale, far lesser [sic] than that alleged at the hearing (Exhibit 7F). In August 2015, treatment notes from Jasper Family Practice shows that the claimant moved all of his extremities well with no cyanosis, clubbing, or edema (Exhibit 8F). He was encouraged to exercise at least three times a week.

(Tr. at 15). Wade contends that the ALJ failed to demonstrate good cause for affording little weight to Dr. Bivona's opinion. Specifically, Wade asserts that the ALJ impermissibly found that Dr. Bivona's medical source statement conflicts with his own medical records. The ALJ pointed to the following inconsistencies: (1) numerous notations indicating "no ataxic gait;" (2) counseling by Dr. Bivona to exercise more; and (3) a pain level of three out of ten during one clinic visit.

The ALJ erred in affording little weight to the medical source statement prepared by Dr. Bivona. The medical source statement is not inconsistent with Dr. Bivona's records or the record as a whole. Each of the alleged inconsistencies either does not exist or is misconstrued by the ALJ.

First, Dr. Bivona's records do not conflict with his statement that Wade has an abnormal gait. While Dr. Bivona indicates that Wade does not present with an ataxic gait, this notation does not indicate that Wade's gait is normal. In fact, it is possible to have an abnormal gait despite not presenting with an ataxic gait. *See Andrews v. Astrue*, 917 F. Supp. 3d 624, 640 (N.D. Tex. 2013) ("Although Andrews' gait was "slow and antalgic," it was "non-ataxic"). An ataxic gait is "an unsteady, uncoordinated walk, with a wide base and the feet thrown out, coming down first on the heel and then on the toes with a double tap." *Gait*, The Free Dictionary, https://medical-dictionary.thefreedictionary.com/ataxic+gait (last visited September 21, 2018); see also https://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/movement_disorders/ataxia/conditions/index.html ("An unsteady, staggering gait is described as an ataxic gait because walking is uncoordinated and appears to be 'not ordered.'"). An ataxic gait is caused by neurological abnormalities or disorders. *See What is Ataxia*, Johns Hopkins Medicine, https://www. hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/movement_disorders

/ataxia/conditions/index.html (last visited September 21, 2018). Conversely, an antalgic gait is "a limp adopted so as to avoid pain on weight-bearing structures, characterized by a very short stance phase[,]" without neurological involvement. *Gait*, The Free Dictionary, https://medical-dictionary.thefreedictionary.com/ataxic+gait (last visited June 26, 2018); see also https://medical-dictionary.thefreedictionary.com/antalgic+gait ("antalgic gait a limp adopted so as to avoid pain on weight-bearing structures, characterized by a very short stance phase.") (last visited September 21, 2018).

Importantly, when Dr. Bivona notes that Wade does not have an ataxic gait, Dr. Bivona makes this notation in the "neurologic" category of the physical examination. (Tr. at 303, 307, 310, 313, 327, 351). Therefore, Dr. Bivona's own records indicate that this notation does not speak to the existence of an abnormal gait caused by pain from Wade's bilateral hip replacements. Furthermore, Dr. Baalmann, a doctor who provided an opinion to Alabama Disability Determinations Service, noted that

> The claimant ambulates with difficulty, but [he] is able to do so without an assistive device. The claimant is able to get up and out of the chair without difficulty. The claimant has difficulty getting on and off the exam table. Gait is abnormal and is markedly myopathic (limp with the left lower extremity)."
>
> . . .

> Difficulty walking and sitting: There is decreased strength of the left hip at 4-/5 in all directions and decreased range of motion of the left hip, as described. Gait was slow and appeared myopathic with the left hip being limped. No ambulatory assist device was needed.

(Tr. at 318). Therefore, Dr. Bivona's statement regarding Wade's abnormal gait is not inconsistent with his own medical records or with Dr. Baalmann's additional record. Because the ALJ misunderstood the meaning of Dr. Bivona's treatment notes, the reference to the lack of an "ataxic gait" is not substantial evidence supporting the ALJ's conclusion that good cause existed to afford little weight to Dr. Bivona's opinion.

Second, Dr. Bivona's records do not conflict with his statement that "prolonged standing really exacerbates" Wade's chronic pain problem and his abnormal gait. (Tr. at 15, 360). Because Dr. Bivona counseled Wade to exercise routinely and to exercise three times a week, the ALJ found that Dr. Bivona's own records were inconsistent with this statement. However, the ALJ reviewed these notations in isolation, devoid of context. To help manage Wade's metabolic syndrome, Dr. Bivona counseled Wade to "exercise routinely, avoid sugars and sweets, [consume] absolutely no sugar beverages, [and] minimize starches." (Tr. at 311, 314, 328). Furthermore, to achieve a healthy heart lifestyle (presumably to lose weight and alleviate his hypertension and high cholesterol), Dr. Bivona counseled Wade to "exercise at least 3 times a week, keep blood pressure and

cholesterol normal, seek medical attention for any chest pain, [and] adhere to medical plan." (Tr. at 331). In other words, Dr. Bivona counseled Wade to exercise to help with his other medical conditions, not to help alleviate his pain.

Furthermore, counseling Wade to exercise does not indicate that Dr. Bivona believed that Wade was physically capable of completing full-body exercises.[2] Conceivably, Wade could complete a variety of exercises that would help alleviate his hypertension and high cholesterol, but that would minimize the impact on his hips, would not require prolonged standing, and would not implicate his abnormal gait. In fact, approximately two weeks after Dr. Bivona counseled Wade to exercise three times per week, Wade was unable to elevate his heart rate to its peak rate during a cardiac stress test because of his hip pain. (Tr. at 333). Importantly, at his next visit, Dr. Bivona counseled Wade to "rest, take meds if prescribed by your doctor, apply heat 3-4 times a day, try passive stretching if instructed by your doctor, [and] notify us if no improvement after a few days" in response to pain in his spine. (Tr. at 352, 356). Dr. Bivona's opinion that prolonged standing exacerbates Wade's chronic pain and abnormal gait is not inconsistent with his own records.

---

[2] The ALJ had the duty to develop the record where there was confusion and ambiguity in the medical records. To the extent, therefore, that Dr. Bivona's recommendation of exercise seemed inconsistent with his finding that prolonged standing exacerbated Wade's hip pain, he should have undertaken to get clarification from Dr. Bivona about the nature of exercise he recommended.

Third, Dr. Bivona's records do not conflict with his statement that Wade "suffers from chronic pain." (Tr. at 15, 360). Because the plaintiff reported a pain level of three out of ten on the morning of June 17, 2015, the ALJ found that Dr. Bivona's statement regarding chronic pain was inconsistent with his own records. Wade first reported hip and back pain on November 17, 2011, and Dr. Bivona prescribed Lortab to Wade. (Tr. at 301-02). On June 13, 2012, Wade reported increased hip pain to Dr. Bivona, and Dr. Bivona again prescribed Lortab to Wade. (Tr. at 303-05). Subsequently, Dr. Bivona diagnosed Wade with arthritis and continued to prescribe Lortab to Wade on August 6, 2013. (Tr. at 309-11). During a clinic visit on May 28, 2014 (still before the amended alleged onset date), Wade reported a pain level of four out of ten caused by his arthritis, and Dr. Bivona noted that the arthritis was chronic with an overall duration for years. (Tr. at 312). Dr. Bivona further noted that medications relieved the pain and changed Wade's prescription from Lortab to Norco. (Tr. 312-14). On June 17, 2015, the visit that the ALJ relies upon for the inconsistency, Wade again complained of arthritis, and Dr. Bivona continued Wade's prescription for Norco despite Wade reporting a pain level of three out of ten. (Tr. at 326-29). Dr. Bivona noted that Wade has chronic pain in his hips. (Tr. at 329). On August 19, 2015, Dr. Bovina continued to prescribe Norco to Wade for his chronic pain syndrome. (Tr. at 331).

Approximately two months later, on October 5, 2015, Wade complained of his arthritis, reporting a pain level of eight out of ten. (Tr. at 350). Dr. Bivona ordered x-rays of his hips, continued his prescription for Norco, and instructed Wade to continue using NSAIDS. (Tr. at 352). The x-rays did not reveal any "evidence of fracture, dislocation or loosening of the hardware." (Tr. at 358-59). Additionally, the "[s]oft tissues [were] unremarkable." (Tr. at 358-59). Dr. Lemak's office also performed x-rays on October 15, 2015, assessing "[b]ilateral hip pain greater on the left of unclear etiology" and noting "generalized tenderness to palpation[,] . . . trochanteric bursa was with some pain on motion[, and] limitation of motion with internal or external rotation" during the physical examination. (Tr. at 363). The x-rays, however, revealed that the "prosthesis appear[ed] to be in good position bilaterally." (Tr. at 363). Finally, on February 8, 2016, Wade again complained of arthritis, reporting a pain level of seven out of ten. (Tr. at 354). Dr. Bivona continued the Norco prescription, prescribed Mobic for Wade to try, and advised Wade to discontinue use of over-the-counter NSAIDS. (Tr. at 357). Thus, significant records demonstrate that Wade experienced chronic pain based on consistent reports and assessments of pain and prescriptions for Lortab and Norco despite reporting pain levels of three and four out of ten during two clinic visits. Over time in late 2015 and early 2016, Dr.

Bivona's records indicate that Wade was experiencing *increasing* as the level of pain went from three or four out of ten to seven or eight out of ten.

Dr. Bivona's opinion regarding Wade's chronic pain is not inconsistent with his own records. Dr. Bivona consistently noted Wade's complaints of pain and arthritis, going back as far as approximately 2012, and he consistently prescribed narcotic pain medications to Wade during this time. As to his opinion regarding Wade's abnormal gait, while his records do not speak to an antalgic gait, Dr. Baalmann's and Dr. Lemak's examinations in 2015 corroborate Dr. Bivona's opinion regarding Wade's abnormal gait. As to his opinion concerning exercises, the exercise counseling was intended to help treat Wade's chronic metabolic syndrome and high cholesterol, not to help alleviate his hip pain. In fact, as Wade's pain increased in October 2015 and February 2016, Dr. Bivona retreated from that advice and advised Wade to rest to minimize his pain.

Additionally, in his decision, the ALJ takes issue with the long periods of time between Wade's clinic visits, often six to eight months at a time. (Tr. at 15). The ALJ found that Wade "has received only very conservative routine treatment since his hip replacements, and no evidence suggests that his condition has deteriorated or that he had physical decompensation of his condition near his amended alleged onset date of disability or even at the original alleged onset date of disability." (Tr. at 15). Presumably, the ALJ believes that Wade did not go to

see Dr. Bivona because he was not in pain or because he was effectively managing his pain without Dr. Bivona's assistance. However, nothing in the record supports this assumption. Without evidence in the record to explain the reason for long gaps between visits, the ALJ speculated as to the reason why Wade went many months between visits and impermissibly relied on this speculation in setting the plaintiff's RFC. *See Lynch v. Astrue*, 358 F. App'x 83, 87 (11th Cir. 2009) ("[A]n undue degree of speculation is not substantial evidence.").

The ALJ must, on remand, determine why Wade often did not visit Dr. Bivona for six to eight months at a time. The court notes that Wade visited the Jasper Family Practice Group on September 2, 2010. (Tr. at 287). However, Wade did not again visit the Jasper Family Practice Group until April 22, 2011, explaining that he had not been to visit the clinic because he had "been out of insurance. . . ." (Tr. at 290). It is conceivable that insurance influenced the long periods of time between clinic visits, not because of the absence or minimal effect of his hip pain.

For these reasons, the court finds that the ALJ did not have good cause to disregard Dr. Bivona's medical source statement purportedly because his opinions were consistent with the record as a whole. *See Crawford*, 363 F.3d at 1159-60; *Phillips*, 357 F.3d at 1240-41. Accordingly, substantial evidence does not support the ALJ's decision to give little weight to Dr. Bivona's opinion in the medical

source statement; therefore, it is premature to address the plaintiff's second issue that the RFC is not supported substantial evidence.

## IV. Conclusion

Upon review of the administrative record, and considering all of Mr. Wade's arguments, the Court finds the Commissioner's decision is not supported by substantial evidence and is not in accord with the applicable law because the ALJ improperly accorded little weight to the claimant's treating physician. The Commissioner's decision is due to be remanded for further consider Dr. Bivona's opinion, together with any additional clarification of his treating advice. A separate order will be entered.

DONE this 24st day of September, 2018.

_____
T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE